T.C. Memo. 2013-169

UNITED STATES TAX COURT

ABDOLREZA T. AZIMZADEH AND ZOHRA EHSAN, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 17924-10.                     Filed July 23, 2013.

Abdolreza T. Azimzadeh and Zohra Ehsan, pro se.

Timothy R. Berry, Nicholas D. Doukas, and Jon D. Feldhammer, for
respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

HOLMES, Judge:  Abdolreza Azimzadeh and his wife, Zohra Ehsan, earned

most of their income in 2006 from Stevens Creek Auto Center, a small used-car

business in California.  But Azimzadeh and Ehsan had hundreds of thousands of

[*2] dollars moving in and out of their bank accounts, additions to the dealership's inventory of more than a million dollars, and some of kind of arrangement--it is not quite clear what kind--with a third party who may or may not have been Azimzadeh's partner. All supported--or so Azimzadeh said--by records that were in disarray, missing, altered, or never in existence at all.

We'll open the hood and see what's going on.

FINDINGS OF FACT

At Stevens Creek, Azimzadeh peddled everything from budget sedans and minivans up to posh BMWs and Porsches. He and Ehsan also had other jobs--he took care of his mother under California's In-Home Supportive Services (IHSS) program, and she worked for a couple of staffing agencies and as a makeup artist for Christian Dior. The couple filed a joint 2006 return six months late, and didn't report income from these side jobs because they say they didn't get most of their W-2s. Their troubles began when the Commissioner selected them for audit.

The audit quickly tanked. Azimzadeh's recordkeeping for Stevens Creek was an incomplete jumble of barely legible documents, so the Commissioner did a bank-deposits analysis to get at the car business's gross receipts, and then he disallowed all of the inventory costs and expenses. The Commissioner sent Azimzadeh and Ehsan a notice of deficiency for 2006 saying that they had almost

[*3] $200,000 in unreported income, disallowing $1.2 million of various losses, deductions, and expenses, and imposing over $200,000 in additions to tax and penalties.  The following chart summarizes what Azimzadeh and Ehsan reported on their tax return, the Commissioner's initial determinations, his later concessions, and what's still left for us to decide:

| | As reported on tax return | As determined | Commissioner's concessions | Still in dispute |
|---|---|---|---|---|
| Schedule C gross receipts | $1,215,825 | $1,395,034 | -0- | $179,209.00 |
| Schedule C cost of goods sold | 1,023,825 | -0- | $350,610.57 | 673,214.43 |
| Schedule C other expenses | 108,767 | -0- | 127,788.00 | Additional receipts from Azimzadeh |
| Schedule E real estate loss | 9,283 | -0- | -0- | 9,283.00 |
| Taxable interest | -0- | 49 | -0- | 49.00 |
| Short-term gain | -0- | 3,651 | -0- | 3,651.00 |
| Wages, salaries and tips | 7,045 | 22,716 | -0- | 15,671.00 |
| Federal income tax withholding | 624 | 873 | -0- | 249.00 |
| Home mortgage interest | 54,240 | -0- | -0- | 54,240.00 |

**[\*4]** Azimzadeh and Ehsan were California residents when they filed their petition. We tried the case in San Francisco.[1] Another issue arose at trial-- whether Azimzadeh conducted his business as a partnership with another man in the car trade, Ray Barghi, or Barghi's business, Luxury for Less.

We must also decide whether Azimzadeh and Ehsan owe an accuracy-related penalty under section 6662(a)[2] and an addition to tax under section 6651(a)(1) for failing to timely file their tax return.

OPINION

We start with a reminder that the Commissioner's deficiency determinations are presumed correct, and taxpayers bear the burden of proving otherwise. See Rule 142(a); INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992). The Code also requires taxpayers to maintain records sufficient to substantiate their claimed deductions, including records of their inventories. See sec. 6001; sec. 1.6001-1(a), Income Tax Regs.

---

[1] Though Ehsan's name was on the petition, she neither signed the stipulation of facts nor appeared at trial. We therefore granted the Commissioner's oral motion to dismiss her from the case for lack of prosecution, with the understanding that the decision we enter as to her will be the same amount we ultimately determine for her husband.

[2] Unless we say otherwise, all section references are to the Internal Revenue Code in effect for the year in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.

[*5] I. Partner or Sole Proprietor

We begin our analysis with an important question that affects the rest of Azimzadeh's case: Was Stevens Creek his own business, or did he own it in partnership with someone else? The potential partner here is a man named Ray Barghi. Azimzadeh testified that he and Barghi were partners in a "joint partnership" from October 2005 until October 2006. If we find a partnership, that would reduce the deficiency, addition to tax, and penalty that Azimzadeh and his wife owe. The Commissioner doesn't think that Azimzadeh and Barghi were partners, and asked us to look at California law to see if they were. But federal tax law, and only federal tax law, controls the classification of "partners" and "partnerships" for federal tax purposes. See sec. 301.7701-1(a), Proced. & Admin. Regs.; see also Commissioner v. Tower, 327 U.S. 280, 288, 290 (1946).

A partnership is a business entity with two or more owners. See secs. 301.7701-1(a)(1), 301.7701-3(a), Proced. & Admin. Regs. The business entity requirement doesn't mean that the partnership needs to exist separately from its owners or otherwise be recognized under state law, see sec. 301.7701-1(a)(1), Proced. & Admin. Regs., so it's not fatal that Azimzadeh and Barghi didn't form a separate state-law entity to do business. Rather, the hallmark of a partnership is that "the participants carry on a trade, business, financial operation, or venture and

**[*6]** divide the profits therefrom." See sec. 301.7701-1(a)(2), Proced. & Admin. Regs. We look to several factors:

1. the agreement of the parties and their conduct in executing its terms;

2. the contributions, if any, which each party has made to the venture;

3. the parties' control over income and capital and the right of each to make withdrawals;

4. whether each party was a principal and coproprietor, sharing a mutual proprietary interest in the net profits and having an obligation to share losses, or whether one party was the agent or employee of the other, receiving for his services contingent compensation in the form of a percentage of income;

5. whether business was conducted in the joint names of the parties;

6. whether the parties filed Federal partnership returns or otherwise represented to the Commissioner or to persons with whom they dealt that they were joint venturers;

7. whether separate books of account were maintained for the venture; and

8. whether the parties exercised mutual control over and assumed mutual responsibilities for the enterprise.

See Luna v. Commissioner, 42 T.C. 1067, 1077-78 (1964). The "essential question is whether the parties intended to, and did in fact, join together for the present conduct of an undertaking or enterprise." Id. at 1077 (citing

[*7] Commissioner v. Culbertson, 337 U.S. 733 (1949)); see also Tower, 327 U.S. at 286-87; Southgate Master Fund, L.L.C. ex rel. Montgomery Capital Advisors v. United States, 659 F.3d 466, 488 (5th Cir. 2011); TIFD III-E, Inc. v. United States, 459 F.3d 220, 231-32 (2d Cir. 2006). We'll look at each of these factors.

Parties' Agreement. We'd expect some kind of formal agreement when two unrelated businessmen agree to join together in a new enterprise. But Azimzadeh didn't produce evidence of any written partnership agreement or contract formalizing the arrangement between him and Barghi, and he told the Commissioner that no written agreement ever existed. He also didn't testify to the terms of any oral agreement about how the two would divvy things up, or call Barghi to do the same. Azimzadeh admitted that Barghi withdrew varying sums of money at irregular intervals, when he needed to buy more cars or pay his personal expenses, but didn't explain how they calculated the amount of those withdrawals. This factor weighs against finding a partnership.

Parties' Contribution to the Venture. Azimzadeh testified that he and Barghi each contributed $100,000 to their venture near the end of 2005. This isn't backed up by his bank records--Stevens Creek's only bank account had a balance under $1,000 at the end of 2005. He also testified that Barghi contributed several hundred thousand dollars' worth of cars to their venture. The car receipts show

[*8] that Luxury for Less purchased over $408,880[3] worth of cars that Stevens Creek later sold.  Azimzadeh testified that "all the cars and property [were] the Stevens Creek Auto Center's," but there aren't any title transfer records from Luxury for Less to Stevens Creek for any of the cars.  So we're not sure whether the cars were actually contributed to the venture or remained Luxury for Less's separate property on a mere consignment to Stevens Creek.  Because the evidence is mixed, this factor is neutral.

Parties' Control Over Income and Capital.  Stevens Creek had only one bank account, and Barghi was authorized to write checks on this bank account.  Throughout the year Barghi signed a large number of the checks written on the account, including large checks written to himself or to Luxury for Less.  This factor weighs in favor of finding a partnership.

Coproprietors Versus Another, Nonpartner, Relationship.  Azimzadeh testified at different times that Barghi was a "supplier", and that "I owned the

---

[3] Azimzadeh testified that Luxury for Less bought $400,715 worth of cars that Stevens Creek later sold.  The records he provided don't add up to this amount, but it's close.  We have purchase records for 18 cars that Luxury for Less bought for a total of more than $441,550 (there's one car without a price, a 1995 BMW).  And we have records that show that Stevens Creek ultimately sold 16 of those cars, whose original purchase price added up to $408,880.  We don't know what happened to the remaining two cars.  So we find that Barghi contributed (or transferred in some way) cars worth more than $408,880.

[*9] business," but that for most of 2006 Barghi was a "partner". If Azimzadeh is to be believed, he and Barghi decided to do business together because Barghi had a wholesale license to buy cars, and Azimzadeh had a retail license and storage space for selling cars. Azimzadeh very clearly spelled out for us that many of the payments to Barghi were "draws". He did not, however, produce Barghi to testify about the nature of the payments, or explain why Barghi could not testify. And the evidentiary trail of receipts and checks in the record leaves only the muddiest of tracks. While many of the checks to Barghi have "DRAW" written in the note column, there's no evidence that Azimzadeh regularly received matching "draws" from the venture's funds. And we find no relationship between the payments made to Barghi and the purchase price, sale price, or profits made on the Luxury for Less cars in the chaotic stack of purchase and sale documents and checks that Azimzadeh gave us. The payments to Barghi are little better than random. We can't tell from the money trail whether Barghi was a supplier, a bailor, or a partner. Azimzadeh testified that Barghi reported the profits from their venture on his tax return, but there's no evidence that Azimzadeh or Stevens Creek or anyone else ever issued Barghi a K-1, 1099, or a W-2. The evidence is a mess, and Azimzadeh's testimony that he and Barghi were partners isn't enough to find this factor to be in his favor.

[*10] Whether Business Was Conducted in Joint Names. Azimzadeh held Barghi out as a partner at trial, but he didn't testify that Barghi represented himself as a partner to customers or other businesses. And once again, he didn't produce Barghi to testify. All of the sales records Azimzadeh handed over list Stevens Creek, not Barghi or Luxury for Less, as the only seller even when the car was originally bought by Luxury for Less. This factor weighs against finding a partnership.

Return Filings. As we've said, Azimzadeh didn't give Barghi a K-1, 1099, W-2, or any other tax form reflecting the money paid to him. More tellingly, Azimzadeh reported all of Stevens Creek's income and expenses--including the entire amount paid for the Luxury for Less cars--on his own tax return. This factor weighs against finding a partnership.

Separate Books. Keeping any sort of orderly records for his business doesn't appear to have been Azimzadeh's strong suit, but he didn't produce any books or accounting that reflected Barghi's separate interest in their venture. That's something we'd expect to find in an arm's-length business deal, so this factor weighs against finding a partnership.

Mutual Control and Responsibilities. Azimzadeh testified that Stevens Creek had a joint account over which Barghi had equal control. The numerous

[*11] checks that Barghi signed corroborate that story. But there's no evidence of what Barghi's role was beyond his signature on many of the checks and a few of the sales records. Overall, this factor is neutral.

Only one Luna factor weighs in favor of finding a partnership. The rest are either neutral or weigh against finding that Azimzadeh and Barghi joined together as partners. Azimzadeh bears the burden of proving the Commissioner's determinations wrong, and he hasn't met it here. We find that no partnership existed.

## II.  Gross Receipts

The Commissioner claims that Azimzadeh underreported his income and he used a bank-deposits analysis to reconstruct Azimzadeh's gross receipts for 2006-- a method long approved by our Court. See Factor v. Commissioner, 281 F.2d 100, 114-16 (9th Cir. 1960), aff'g T.C. Memo. 1958-94; DiLeo v. Commissioner, 96 T.C. 858, 867 (1991), aff'd, 959 F.2d 16 (2d Cir. 1992).

This kind of analysis begins with a list of deposits into a bank account. The Commissioner isn't required to show that each deposit is income, Gemma v. Commissioner, 46 T.C. 821, 833 (1966), or that it came from a particular, or even probable, source, Clayton v. Commissioner, 102 T.C. 632, 645 (1994). But he must, as he did in this case, subtract from the total deposited any income that the

**[\*12]** taxpayer reported and any nontaxable items (e.g., loans or gifts) to determine unreported income. See DiLeo, 96 T.C. at 868. Unexplained bank deposits are *prima facie* evidence of income where a taxpayer has failed to maintain adequate records. Tokarski v. Commissioner, 87 T.C. 74, 77 (1986). It's the taxpayer's burden to show that the Commissioner's bank-deposits analysis isn't right--for example, by proving that a particular deposit came from a nontaxable source. Rule 142(a); Clayton, 102 T.C. at 645.

The Commissioner's revenue agent added up all of Stevens Creek's deposits made by check, wire transfer, and cash. He excluded any nontaxable deposits--for example, checks payable to Azimzadeh individually. He didn't exclude any cash withdrawals, but Azimzadeh hasn't argued that the cash deposits and withdrawals were a circular flow of cash, and it's Azimzadeh who'd bear the burden of proof on that point. See Rule 142(a); MacGregor v. Commissioner, T.C. Memo. 2010-187, 2010 WL 3322509, at \*11. We thus find that the revenue agent's bank-deposits analysis accurately reflected Azimzadeh's gross receipts, and sustain the Commissioner's determination that Azimzadeh underreported his gross receipts.

III. Cost of Goods Sold

Cost of goods sold is subtracted from gross receipts to compute gross business income. Sec. 1.61-3(a), Income Tax Regs. It is not a deduction, and so

[*13] isn't subject to the limits on deductions in section 162, Metra Chem. Corp. v. Commissioner, 88 T.C. 654, 661 (1987), but any amount claimed as cost of goods sold still has to be substantiated, King v. Commissioner, T.C. Memo. 1994-318, 1994 WL 330613, at *2, aff'd without published opinion, 69 F.3d 544 (9th Cir. 1995). The notice of deficiency disallowed all $1,023,825 in cost of goods sold that Azimzadeh reported on his return because he didn't substantiate those expenses. At trial the Commissioner allowed $350,610.57 for the cost of 21 of the cars that Azimzadeh proved he had sold in 2006.

One common way of computing cost of goods sold is to start with inventory at the beginning of the year, add any new purchases during the year, and subtract any inventory remaining at the end of the year. See sec. 1.162-1(a), Income Tax Regs. That's what Azimzadeh did on his tax return to arrive at $1,023,825--he reported a starting inventory of $13,300, added purchases and other costs during 2006 of $1,045,825, and subtracted closing inventory of $35,300. There are problems with these numbers. Azimzadeh gave us evidence that he spent over $1 million acquiring new cars during 2006. But we can't verify his beginning and ending inventory figures. This led the Commissioner to argue at trial that Azimzadeh should be allowed to claim only the cost of the cars that he can prove he sold in 2006. Azimzadeh objected because he claims the Commissioner asked

**[\*14]** him for sales records only for the Luxury for Less cars, not for all the cars that he sold in 2006. But one of the Commissioner's paralegals, who had attended all of the <u>Branerton</u> conferences,[4] credibly testified that IRS attorneys told Azimzadeh very clearly to provide "all documents" relating to his business in 2006, at one point even writing "'all documents' in pretty big writing." And Azimzadeh did provide many records unrelated to Luxury for Less cars, just not all of them. We were left with no 2006 sales records for over $600,000 worth of those cars. That number just doesn't fit with the $35,300 ending inventory he reported on his tax return.

Taxpayers generally have broad latitude in selecting their method of accounting, but "[n]o method of accounting is acceptable unless, in the opinion of the Commissioner, it clearly reflects income." <u>See</u> sec. 1.446-1(c)(1)(ii)(C), Income Tax Regs. Given Azimzadeh's banged-up credibility, <u>see</u> <u>infra</u> note 6, and the sparseness of his inventory records, we agree with the Commissioner's decision to require proof that a car was sold in 2006 before allowing it as cost of goods sold. We'll allow additional car purchases--besides the 21 cars that the Commissioner

---

[4] Our rules encourage the parties to make reasonable informal efforts to exchange facts, documents, and other data to encourage more expedient trials and to encourage settlement. <u>See</u> Rule 70(a)(1); <u>Branerton Corp. v. Commissioner</u>, 61 T.C. 691, 692 (1974).

[*15] already conceded--only where Azimzadeh has adequately substantiated that he (1) actually purchased the car, and (2) that the car was sold in 2006. His ending inventory number is just too small to do otherwise.

Most of the cars that Azimzadeh purchased don't satisfy that second requirement--while we have a credible, legible record that Stevens Creek bought the car, there's no corresponding proof that it sold the car in 2006 (or any other time). The Commissioner asked Azimzadeh for sales records many times, and Azimzadeh promised them to us, too. But we still don't have them, so these cars are disallowed:

| Date purchased | Purchaser | Purchase price | Last five digits of VIN |
| --- | --- | --- | --- |
| 11/17/2005 | SCAC | $8,200.00 | 19148 |
| 1/4/2006 | SCAC | 18,000.00 | 55790 |
| 1/4/2006 | SCAC | 2,750.00 | 40608 |
| 1/13/2006 | SCAC | 10,250.00 | 00609 |
| 1/18/2006 | SCAC | 3,500.00 | 17390 |
| 1/18/2006 | SCAC | 1,600.00 | 07285 |
| 1/24/2006 | SCAC | 200.00 | 01961 |
| 1/26/2006 | SCAC | 5,300.00 | 60336 |
| 2/2/2006 | SCAC | 600.00 | 76298 |
| 2/8/2006 | SCAC | 745.00 | 06298 |

| | | | |
|---|---|---|---|
| **[*16]** 2/22/2006 | SCAC | 7,300.00 | 77526 |
| 3/2/2006 | SCAC | 11,275.00 | 18442 |
| 3/2/2006 | SCAC | 11,025.00 | 62808 |
| 3/6/2006 | SCAC | 14,700.00 | 64750 |
| 3/21/2006 | SCAC | 1,970.00 | 96366 |
| 3/29/2006 | SCAC | 7,500.00 | 02232 |
| 5/3/2006 | SCAC | 10,200.00 | 24847 |
| 5/10/2006 | SCAC | 3,100.00 | 61524 |
| 5/17/2006 | SCAC | 12,190.00 | 16254 |
| 5/22/2006 | SCAC | 14,935.36 | 01155 |
| 6/4/2006 | SCAC | 17,700.00 | 01810 |
| 6/8/2006 | SCAC | 25,750.00 | 90746 |
| 6/14/2006 | SCAC | 17,910.00 | 04306 |
| 6/28/2006 | SCAC | 4,700.00 | 81422 |
| 7/6/2006 | SCAC | 27,000.00 | 00533 |
| 7/15/2006 | SCAC | 10,500.00 | 29957 |
| 8/3/2006 | SCAC | 16,000.00 | 80526 |
| 8/3/2006 | SCAC | 11,750.00 | 01804 |
| 8/3/2006 | SCAC | 14,500.00 | 81396 |
| 8/7/2006 | SCAC | 14,750.00 | 37826 |
| 8/16/2006 | SCAC | 5,450.00 | 81006 |
| 8/31/2006 | SCAC | 9,250.00 | 00620 |
| 9/28/2006 | SCAC | 13,600.00 | 70693 |
| 9/28/2006 | SCAC | 27,000.00 | 09313 |

| [*17] 9/28/2006 | SCAC | 22,500.00 | 98797 |
|---|---|---|---|
| 10/6/2006 | SCAC | 2,459.00 | 26334 |
| 10/11/2006 | SCAC | 2,600.00 | 11597 |
| 10/11/2006 | SCAC | 3,800.00 | 09516 |
| 10/12/2006 | SCAC | 12,025.00 | 48695 |
| 10/12/2006 | SCAC | 12,475.00 | 28149 |
| 10/17/2006 | SCAC | 16,700.00 | 15196 |
| 10/20/2006 | SCAC | 6,500.00 | 61167 |
| 11/8/2006 | SCAC | 4,500.00 | 96514 |
| 11/8/2006 | SCAC | 5,300.00 | 83085 |
| 11/16/2006 | SCAC | 7,400.00 | 91069 |
| 11/16/2006 | SCAC | 6600.00 | 85618 |
| 11/16/2006 | SCAC | 13,000.00 | 06643 |
| 12/7/2006 | SCAC | 13,075.00 | 49249 |
| 12/7/2006 | SCAC | 15,025.00 | 58477 |
| 12/30/2006 | SCAC | 13,470.00 | 53796 |
| 12/30/2006 | SCAC | 14,250.00 | 58342 |

Azimzadeh also gave us documents that were not entirely legible to show he bought a few other cars--on some we can't read the car's VIN, and on some we can't read the amount he bought it for. There's no corresponding proof that he sold these cars in 2006, either. Even if there was, we couldn't match them up or pick an amount to allow. These cars are disallowed as costs of goods sold:

| [*18] Date purchased | Purchaser | Purchase price | Last five digits of VIN | Model |
|---|---|---|---|---|
| 3/21/2006 | SCAC | $19,329.70 | Unknown | 2005 Mini |
| 7/26/2006 | SCAC | 27,794.21 | Unknown | 2002 Mercedes |
| 8/30/2006 | SCAC | 29,103.46 | Unknown | 2002 Mercedes |
| 9/28/2006 | SCAC | 27,385.20 | Unknown | 2003 Mercedes |
| Unknown | SCAC | Unknown | Unknown | Unknown |

A few other cars present a tougher question of substantiation, because the purchase documents show that Luxury for Less, not Stevens Creek, bought them. Azimzadeh gave us checks from Stevens Creek payable to Luxury for Less that referenced individual, identifiable cars in the memo lines. Those cars are easy, and the Commissioner allowed them. The question is what to do with the other cars-- ones where there's no corresponding payment from Stevens Creek to Luxury for Less specifically identifying that car. We have checks showing that Stevens Creek paid Luxury for Less or Barghi a total of $396,103.17. The Commissioner's already allowed $254,440 of that amount for 11 cars. But that leaves $141,663.17 of those payments that the Commissioner hasn't allowed because they weren't traceable to any particular Luxury for Less car. We also have records that show

**[*19]** that Luxury for Less was the source of about $408,880 worth of cars that Stevens Creek sold in 2006--and the Commissioner accounted for $254,440 of these, which leaves $154,440 to make sense of.[5] We can take our best guess at the amount of an additional expense when there's enough evidence in the record for us to conclude that the taxpayer incurred expenses in at least the amount allowed, but where the exact amount above that isn't clear. See Williams v. United States, 245 F.2d 559, 560 (5th Cir. 1957); Cohan v. Commissioner, 39 F.2d 540, 543-44 (2d Cir. 1930). We're also allowed to make that estimate bearing heavily against a taxpayer whose bad records are his own fault. See Cohan, 39 F.2d at 544. Although we can't tie $141,663.17 of the payments to Barghi or Luxury for Less to specific cars, we find it more likely than not that most of those payments were in exchange for the $154,440 worth of Luxury for Less cars that are still unaccounted for. Some of the checks written to Barghi or Luxury for Less were entirely or partially for other expenses--the notes themselves either say so or Azimzadeh cleared that up for us at trial. Those were:

- $3,810.17 for "Retern [sic] Loan";

- $550 reimbursement for a bond and license fee;

---

[5] Plus the value of a 1995 BMW, but we can't read what Luxury for Less paid for it.

[*20] •    $900 reimbursement for travel expenses;

•    $740 reimbursement for advertising expenses;

•    $50 reimbursement for a bank fee;

•    $485 reimbursement for rent;

•    $280 reimbursement for a car repair expense; and

•    $2,300 reimbursement for permit fees.

That adds up to $9,115.17 that Azimzadeh paid Luxury for Less or Barghi that wasn't for cars. That leaves us with $132,548 in unexplained payments from Stevens Creek to Luxury for Less or Barghi, and we find that those payments were in exchange for the remaining Luxury for Less cars. Therefore, we allow an additional $132,548 as cost of goods sold.

We did find records for two cars that the Commissioner missed--Azimzadeh provided credible, legible records showing that Stevens Creek bought the cars, and we found matching records showing that it sold these same cars during 2006. We allow an additional $31,400 in cost of goods sold for these cars:

| Date purchased | Date sold | Purchaser | Purchase price | Last five digits of VIN |
|---|---|---|---|---|
| 3/13/2006 | 5/2/2006 | SCAC | $13,000 | 28545 |
| 5/24/2006 | 5/27/2006 | SCAC | 18,400 | 21874 |

**[\*21]** IV.  Other Expenses

Section 162 allows a deduction for all ordinary and necessary business expenses paid or incurred during the taxable year in carrying on any trade or business.  Whether an expense is ordinary and necessary is generally a question of fact.  Commissioner v. Heininger, 320 U.S. 467, 475 (1943).  To be "necessary", an expense must be "appropriate and helpful" to the taxpayer's business.  Welch v. Helvering, 290 U.S. 111, 113 (1933).  For an expense to be "ordinary", "the transaction which gives rise to it must be of common or frequent occurrence in the type of business involved."  Deputy v. du Pont, 308 U.S. 488, 495 (1940) (citing Welch, 290 U.S. at 114).  The Code does not allow deductions for personal, living, and family expenses.  Sec. 262(a); sec. 1.262-1(a), Income Tax Regs.  Taxpayers are required to maintain records sufficient to establish the amounts of allowable deductions and to enable the Commissioner to determine the correct tax liability.  Sec. 6001; sec. 1.6001-1(a), Income Tax Regs.; Shea v. Commissioner, 112 T.C. 183, 186 (1999).  In general, taxpayers must substantiate deductions with evidence like invoices or receipts that establish that the expenses were actually incurred and the business purpose for those expenses.  See Lyseng v. Commissioner, T.C. Memo. 2011-226, 2011 WL 4389644, at \*3.

[*22] Azimzadeh reported $108,767 in "Other Expenses" on Schedule C of his tax return. The Commissioner initially disallowed all of it, but then allowed all of it and then some--$127,778. That would've settled this point, but Azimzadeh gave us additional documents purporting to substantiate even more expenses.

The Commissioner didn't argue that Azimzadeh should be required to capitalize his direct and indirect expenses--for example, money he spent on cleaning cars or his utility costs--into his inventory costs. Small businesses with gross receipts under $10 million averaged over three years don't have to do that. See sec. 263A(b)(2)(B). So if Azimzadeh substantiates these expenses, he can deduct them for the year he paid or incurred them. We turn to those now.

Some of the additional expenses that Azimzadeh claims are easy to dispose of because they aren't from 2006: invoices or checks clearly dated 2005; invoices that are undated; and, worse, pages upon pages of invoices where Azimzadeh forged the date by changing the 5 in 2005 to look like a 6.[6]

Azimzadeh also gave us some invoices from car-repair shops or shippers that at least appear to be from 2006. But, having dented his credibility with the

---

[6] Azimzadeh actually admitted at trial that he had changed the dates on numerous receipts that he had given to the Commissioner. We find this admission credible, and its natural effect is to reduce the weight we give his testimony on this and other issues.

**[*23]** doctored invoices, we'll allow only those invoices where the date is independently verifiable. There are a few invoices for work done on cars for which we have proof of their presence on Stevens Creek's lot in 2006. Those are:

- Invoice from Cali Touch-Up Service, dated January 31, 2006, for $1,200;

- Invoice from Cali Touch-Up Service, dated August 31, 2006, for $800;

- Invoice from Mr. "TINT" Inc., dated August 7, 2006, for $400;

- Invoice from Quality Smog Center, dated February 18, 2006, for $2,075;

- Invoice from Sunnyvale Valero, dated June 9, 2006, for $4,233.75;

- Invoice from Sunnyvale Valero, dated June 15, 2006, for $1,340;

- Invoice from Courtesy Auto Transport, dated March 2, 2006, for $5,600.

We allow the above amounts as expenses for car repairs and shipping fees. We disallow the remaining car repair or shipping expenses.

We find that Azimzadeh has adequately substantiated a few other miscellaneous expenses:

- $54 paid to B.C.A.A. for "auction fees" on July 5, 2006. We have records that show that Stevens Creek bought several cars from B.C.A.A.

[*24] • $500 paid to San Jose Mercury News on January 18, 2006. Azimzadeh testified that Stevens Creek advertised with the Mercury News.

• $500 paid to San Jose Mercury News on November 16, 2006.

• $320 paid to Rosalio Ramirez on April 18, 2006. The check notes that it's for detailing cars, and we found invoices from Ramirez in the record that confirm that story.

• $120 paid to Rosalio Ramirez on May 8, 2006.

• $360 paid to Rosalio Ramirez on September 13, 2006.

• $12,850 paid to Payam Azimzadeh between January 5, 2006, and September 28, 2006, in 36 separate payments. Azimzadeh testified that Payam is his nephew and worked at Stevens Creek. We have numerous business records with Payam's name on them, so we find that testimony credible.

We also have to figure out how to treat the $9,115.17 that Azimzadeh paid to Barghi or Luxury for Less as reimbursement of his expenses. See supra p. 20. We find those amounts to be deductible, except for the $3,810.17 payment noted "Retern Loan" and the $900 reimbursement for travel expenses.

We disallow the $3,810.17 payment because there's no deduction for repayments of loan principal. See Granger v. Commissioner, T.C. Memo. 1978-474, 1978 Tax Ct. Memo LEXIS 39, at *8, aff'd without published opinion, 618 F.2d 98 (4th Cir. 1980); Phillips v. Commissioner, T.C. Memo. 1972-21, 1972 Tax

[*25] Ct. Memo LEXIS 235, at *4.  Interest paid is deductible, sec. 163, but Azimzadeh didn't show that any part of the payment was for interest.

Section 274(d) also imposes stricter substantiation requirements for travel expenses.  A taxpayer has to show, with records or with sufficient records corroborating the taxpayer's own testimony:  (1) the amount of the expense or other item; (2) the time and place of travel; and (3) the business purpose of the expense or other item.  Sec. 274(d); sec. 1.274-5T(c), Temporary Income Tax Regs., 50 Fed. Reg. 46014 (Nov. 6, 1985).  Azimzadeh testified that neither he nor Barghi kept a log of his travel expenses, so we disallow the $900 reimbursement.

Finally, we disallow any expense where we can't tell how much Azimzadeh paid, when he paid it, or what its business purpose was.  The absence of any of those items is fatal.  Azimzadeh's remaining records lack one or all of those vital bits of information.  He hasn't adequately substantiated the checks written to himself, G.D.R.R. Paris, Hondas Only, Karen Naegeli, PG&E, the San Jose Water Company, and Capital One.  And the illegible documents that he submitted lack any information on which we could find an expense.

V.  Schedule E Loss

Azimzadeh rented a house to one tenant in 2006 and claimed a $9,283 loss on a Schedule E, Supplemental Income and Loss, attached to his Form 1040.  The

**[*26]** Commissioner disallowed the loss in its entirety because he says Azimzadeh hasn't proven that either he or his wife was a real-estate professional or materially participated in the rental activity in 2006.

The Code allows taxpayers to deduct most business-related and profit-seeking expenses under sections 162 and 212, but section 469 limits these deductions when they arise from "passive activities." Passive activities include both (1) trade or business activities where the taxpayer doesn't materially participate, and (2) rental activities. Sec. 469(c)(1) and (2). Section 469 doesn't treat rental activities as passive, however, if the taxpayer devotes at least 750 hours and more than half of his working hours to real-estate businesses. Sec. 469(c)(7).

Azimzadeh hasn't shown that he or his wife fit within the exception. He testified only that he did a few repair jobs in the apartment--he changed the carpet, and fixed some plumbing and heating problems. But that doesn't add up to enough activity to make the rental income nonpassive.

Section 469(i) allows a maximum $25,000 deduction for passive activity losses connected with real estate. It requires only "active participation," which is a much lower bar than "material participation." See Madler v. Commissioner, T.C. Memo. 1998-112, 1998 WL 118075, at *3. The problem for Azimzadeh is that the deduction begins to phase out once a taxpayer's modified adjusted gross income

**[*27]** (i.e., adjusted gross income computed without regard to claimed losses) is above $100,000, and completely phases out by $150,000.  See sec. 469(i)(3)(A).  Our other findings on Azimzadeh's wage income, gross business receipts, costs of goods sold, and business expenses raise his adjusted gross income by more than $650,000.  We thus sustain the Commissioner's determination to disallow that $9,283 of Schedule E losses for the 2006 tax year.

## VI.  Interest

Two third-party payors reported to the Commissioner $16 and $33 of interest income that was not reflected on Azimzadeh's tax return.  At trial, Azimzadeh acknowledged that he received this $49 of interest income, but said he didn't know where it came from.  We therefore sustain the Commissioner's determination.

## VII.  Short-Term Gain

Ehsan's former employer reported that she had received a $3,651 short-term capital gain.  Azimzadeh testified that this income was from a stock option that his wife had owned for a long time, and that she had deposited into his brokerage account.  He did not, however, provide any evidence of his wife's basis or holding period in the option.  We thus sustain the Commissioner's determination.

[*28] VIII. <u>Wage Income and Withholding</u>

The couple also reported $7,045 in wage income and $624 in federal income-tax withholding from Ehsan's job as a makeup artist at Christian Dior. Azimzadeh testified that they received a W-2 from Christian Dior, which is why they reported those wages on their tax return, but didn't get W-2s from any other employer. The Commissioner adjusted their wage income upward by $15,671 and their federal income tax withholding upward by $249 using information provided by third parties. Those numbers break down as follows:

- Barrett Business Services, Inc., reported $8,683 in wages and $168 in federal income tax withholding for Ehsan;

- Randstad Empl. Solutions L.P. reported $2,191 in wages and $81 in federal income tax withholding for Ehsan;

- Xango LLC reported $772 in nonexempt compensation for Ehsan; and

- IHSS Recipients reported $4,453 and $344 in wages for Azimzadeh.

Azimzadeh admitted that his wife received a total of $10,874 in additional wages. He also admitted that he received $4,797 in wages from IHSS, which paid him for taking care of his mother. He hasn't argued that any of the additional wages aren't income, just that he never received any W-2s, so we sustain the Commissioner's determination to increase both the couple's income and their withholding credit.

**[\*29]** IX.  <u>Home Mortgage-Interest Deduction</u>

Azimzadeh claimed a $54,240 mortgage-interest deduction.  The Commissioner disallowed the entire deduction because Azimzadeh hadn't proven that the interest was "qualified residence interest" under section 163(h)(3).

Section 163 allows taxpayers a deduction for "qualified residence interest" paid on the mortgage of their first or secondary home.  Sec. 163(a), (h)(2)(D); sec. 1.163-10T(b), Temporary Income Tax Regs., 52 Fed. Reg. 48410 (Dec. 22, 1987).  Qualified residence interest is either "acquisition indebtedness" or "home equity indebtedness."  Sec. 163(h)(3)(A).  Acquisition indebtedness is a loan of up to $1 million that's used to acquire, construct, or substantially improve a residence when that residence also secures the loan.  Sec. 163(h)(3)(B).  New debt to refinance old acquisition indebtedness counts, as long as it's not more than the refinanced debt.  Sec. 163(h)(3)(B)(i).  Home-equity indebtedness is any other type of loan secured by a qualified residence, but it's capped at the lesser of $100,000, or the fair market value of the residence minus any acquisition indebtedness on the residence.  Sec. 163(h)(3)(C).  There's a limit to qualified-residence interest where the total average balances for the taxable year of all secured debts on a residence are more than the adjusted purchase price of the residence.  Sec. 1.163-10T(c)(1), Temporary Income Tax Regs., 52 Fed. Reg. 48411 (Dec. 22, 1987).

[*30]  The Commissioner got three Forms 1098, Mortgage Interest Statement, from banks reporting that Azimzadeh paid $29,785, $12,256, and $39,960 of mortgage interest in 2006.  Those prove that interest was actually paid, but no more.  The Forms 1098 don't tell us what property secured the loans, the purchase prices of those properties, or when or why Azimzadeh took out the loans.  Azimzadeh testified that he bought their home for $310,000.  He later borrowed money to remodel it, and by 2005 the mortgage balance had risen to $340,000.  He then took out a line credit of $240,000 to $250,000 in late 2005, using some of the money to pay off his credit card and other accrued debts, then investing the remaining $100,000 in Stevens Creek.  But Azimzadeh didn't link any of the Forms 1098 to any of his properties--he testified that he owned his current home back in 2006, but he was living at a different address when he filed his 2006 tax return, and he also owned another house that he rented out.  He didn't say which 1098 reflected which loan.  We also don't know whether Azimzadeh borrowed any money for the initial acquisition of his home or how much he borrowed to do the subsequent renovations.  Cohan allows us to estimate the amount of a deduction, but only when there's enough evidence in the record for us to conclude that the taxpayer incurred an expense in at least that amount.  See Cohan, 39 F.2d at 543-44.  Because we can't match with any certainty the interest shown on the Forms 1098

**[\*31]** to a qualifying loan or to a qualifying property, we sustain the Commissioner's determination to disallow Azimsadeh's entire mortgage-interest deduction.

## X.  Penalties and Additions to Tax

### A.  Section 6662(a) Penalty

The Commissioner seeks a 20% accuracy-related penalty under section 6662(a) for an underpayment attributable to (1) negligence, (2) disregard of rules or regulations, or (3) a substantial understatement of income tax.  See sec. 6662(b)(1) and (2).  The Commissioner has to provide some evidence of one of the bases.  Once he does that, the taxpayer has the burden of proving that the Commissioner's penalty determination was incorrect.  See Rule 142(a); Higbee v. Commissioner, 116 T.C. 438, 446-47 (2001).  A taxpayer can meet this burden by showing that, under all the facts and circumstances, he acted with reasonable cause and in good faith.  Sec. 6664(c)(1); sec. 1.6664-4(b)(1), Income Tax Regs.

We have sustained the Commissioner's determinations that found $179,209 in additional gross business receipts and almost $20,000 in additional income, and that disallowed over $460,000 for cost of goods sold, $54,250 in mortgage interest, and $9,283 for passive losses.  All of that leads to an understatement of more than 10% of the tax required to be shown on the couple's tax return, which is more than

[*32] $5,000.  That makes the understatement substantial under section 6662(d)(1)(A), and so they will owe the 20% penalty unless they can show reasonable cause and good faith.

This is a facts-and-circumstances test, and we focus on the extent to which a taxpayer tried to figure out his proper tax liability while taking into account his experience, knowledge, and education.  Sec. 1.6664-4(b)(1), Income Tax Regs.

We find that Azimzadeh kept entirely inadequate records:  His failure to keep any sort of ledger or even keep all of his receipts reenforces our conclusion that he didn't act reasonably.  We thus find him liable for a penalty for the part of the underpayment attributable to underreported gross receipts and overstated costs of goods sold and other business expenses.

We have a somewhat different analysis of whether he acted with reasonable cause and good faith for all of the remaining understatements of income.  Neither Azimzadeh nor his wife is a tax professional or a highly sophisticated business person, and Azimzadeh is not a native English speaker.  Azimzadeh did have an accountant prepare his 2006 tax return, and we look to the usual three factors to test whether he properly relied on professional advice.  See Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 99 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002).  If he did, that shows reasonable cause and good faith.

**[\*33]** • First, was the adviser a competent professional who had sufficient expertise to justify reliance?

• Second, did the taxpayer provide necessary and accurate information to the adviser?

• Third, did the taxpayer actually rely in good faith on the adviser's judgment?

Id.

Azimzadeh chose a small accounting business to prepare his 2006 tax return; and although we don't know much about its qualifications, we find that the accountant would've appeared competent to a layperson.

On the second point, Azimzadeh failed to turn over four W-2 forms to his accountant. Two of them were sent to his parents' house, and two others (plus the one they did report) were sent to the couple's current address. A reasonably prudent person should try to find out where his missing W-2 forms are, and we do not find Azimzadeh's testimony that he didn't receive them to be credible. So we find that Azimzadeh's failure to give these forms to his accountant does not let him avoid the penalty for not reporting those items. We find the same to be true for the 1099 forms reporting his interest income and short-term capital-gain income. Azimzadeh withheld this information from his accountant.

**[\*34]** We do find that Azimzadeh reasonably relied on the accountant's judgment in claiming a real-estate loss to which he wasn't entitled. Reporting rental income isn't an easy nook of tax law to snuggle into--a reasonable and prudent layperson with Azimzadeh's education and experience wouldn't know to ask about the passive-loss-limitation rules. The same goes for the mortgage interest--what is or isn't qualified residence interest can be difficult to figure, especially when a residence has been refinanced or had equity cashed out more than once. It's an area where a taxpayer is entitled to trust his accountant. We find that Azimzadeh did not withhold any information on these items from his accountant and did act with reasonable cause and in good faith in claiming the real-estate losses and home mortgage-interest deduction.

B. Section 6651(a) Addition to Tax

Section 6651(a)(1) imposes an addition to tax for failure to timely file a tax return. The Commissioner has met his burden of production on this one because Azimzadeh stipulated that he didn't file his 2006 tax return, which was due October 15, 2007, until April 28, 2008. And Azimzadeh hasn't argued that he had

**[*35]** reasonable cause to tardily file.  We thus sustain the Commissioner's determination on the late-filing addition.  The result is mixed, so

<u>Decision will be entered</u>

<u>under Rule 155</u>.